J-S43029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ESTALIN MARFISI | : | |
| | : | |
| Appellant | : | No. 2779 EDA 2024 |

Appeal from the Judgment of Sentence Entered August 23, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008545-2022

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ESTALIN MARFISI | : | |
| | : | |
| Appellant | : | No. 2780 EDA 2024 |

Appeal from the Judgment of Sentence Entered August 23, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008548-2022

BEFORE:  KUNSELMAN, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED MARCH 13, 2026**

Estalin Marfisi was convicted and sentenced for multiple crimes: conspiracy to commit murder, possession of a firearm by a prohibited person, possessing instruments of crime, recklessly endangering another person, and two counts each of firearms not to be carried without a license and carrying

firearms on public streets or public property in Philadelphia.[1] He appealed from the judgment of sentence and challenges the consolidation of his cases, the admission of expert testimony and a cell phone video, the denial of a mistrial, and discretionary aspects of sentencing. We affirm.

Marfisi's convictions stem from charges against him in three cases. One related to Marfisi's involvement on October 3, 2020 in the murder of Kenny Le.[2] Another related to Marfisi's possession on November 15, 2020 of a firearm.[3] A third case related to Marfisi's involvement on November 16, 2020 in the attempted murder of Michael Walker.[4] *See* Motion for Consolidation, filed 5/8/24.

The Commonwealth moved on May 8, 2024, to consolidate the cases. The Commonwealth argued that "all three crimes are tied together by ballistics evidence, which shows that the same 9mm semi-automatic firearm was fired at all three scenes." *Id.* at ¶ 4. It also alleged that all three crimes occurred within a month and a half; the murder of Le and the attempted murder of Walker occurred on the same block; and the motive for the attempted murder was directly tied to the firearm possession that occurred the day before. The Commonwealth maintained that it would use Marfisi's use and possession of

---

[1] 18 Pa.C.S.A. §§ 903(c) (of 2502), 6105(a)(1), 907(a), 2705(a), 6106(a)(1), and 6108(a), respectively.

[2] *See* Common Pleas docket number CP-51-CR-0008545-2022.

[3] *See* Common Pleas docket number CP-51-CR-0008548-2022.

[4] *See* Common Pleas docket number CP-51-CR-0008542-2022.

the firearm to establish identity and motive in each case. *Id.* at 4 (unpaginated).

After a hearing, the court granted consolidation:

> This Court finds that the admission of evidence of other acts is necessary to give full context to the allegations in this case, that the ballistics evidence joins them together, probably is dispositive on its own.
>
> This Court finds that there's ample evidence that overlaps across the three. This Court finds that it would not be confusing to the jury and that it would not be unduly prejudicial.
>
> This Court further finds that there's been ample notice given to Defense and that the notice is fair even if disappointing to the Defense. And, in fact, admission of the other alleged acts is in the interest of justice.

N.T., Motion Volume 1, 5/13/24, at 12.

Marfisi proceeded with a jury trial. On the morning that trial began, the defense objected to the Commonwealth presenting expert testimony about a cell phone extraction report. The report related to a photograph recovered from Marfisi's phone showing him possessing a firearm. *See* N.T., May 14, 2024, at 5. The photograph's metadata listed a capture time of October 10, 2020, at 4:51:17 p.m. *See* Commonwealth Exhibit 98 ("Phone Extraction Analysis"). According to the defense, the date of the photograph was "crucial in this case" because the homicide occurred a week before the date on the photo, on October 3, 2020. N.T., May 14, 2024, at 21. There was also video of Marfisi shooting a gun weeks later, on November 15, 2020, and that it was the same gun as the one in the October 10 photograph. *Id.* Defense counsel

explained that she had previously asked the Commonwealth if it would call an expert to testify about when the photograph was taken and the Commonwealth had assured her that it was not calling an expert witness. *Id.* at 5-6. However, on the morning of trial, counsel received an email from the Commonwealth that a detective would testify as an expert regarding an extraction report of Marfisi's phone and would testify that, based on the metadata, the photograph was taken on October 10, 2020. *Id.* at 6. Counsel argued that if she had known an expert would be called, she would have obtained her own expert or would have talked to Marfisi about when the photograph was taken. *Id.* at 22.

For its part, the Commonwealth maintained that the report was not an expert report but rather "screenshots from the cellphone extraction that [counsel] has, that she's had in evidence since March when I passed everything." *Id.* at 8. The Commonwealth claimed that the detective who conducted the extraction of the phone would testify to the metadata related to the photograph and had experience with the program "Cellebrite, that looks at phone dumps for their job every single day as part of it and explaining what it is." *Id.* at 9. The Commonwealth also explained that when it told counsel that it was not calling an expert witness, "it was specifically in regards to phone location and GPS data[.]" *Id.* at 32.

Defense counsel agreed that the Commonwealth previously provided an extraction report for the cellphone and that it contained the same information as the report the Commonwealth wanted to offer into evidence through the

detective. *Id.* at 9-11. She also agreed that the only difference between the two reports was that certain information was pulled from the extraction report and placed in the detective's report. *Id.* at 11.

The court overruled counsel's objection. *Id.* at 32. It determined that the report the Commonwealth sought to use at trial "is the separation of certain materials already provided to assist in the presentation by the witness" and was "not new material, either conceptually or physically." *Id.* at 18. The court also stated that the detective would have to testify as an expert based on the information related to metadata. *Id.* at 26.

During opening statements, defense counsel told the jury that Marfisi was hospitalized until the end of September 2020, with a bullet in his leg and a colostomy bag. According to counsel, "There was no way he was crouched in any van on October [3], 2020." *Id.* at 70.

Following openings, the Commonwealth presented its evidence. The trial court aptly summarized the Commonwealth's evidence as follows:

> On October 3, 2020, [Marfisi], along with Derrick Vargas, Dominick Butler, Donaven Velezquez and Azim Hayward were in a Chrysler mini-van recently purchased by [Marfisi]. Vargas was the driver, Velezquez was in the front passenger seat, and Hayward was in the rear with Butler and [Marfisi]. [Marfisi] was carrying a nine-millimeter Smith & Wesson semiautomatic handgun. Velezquez a nine-millimeter Glock, and Hayward a .380 semiautomatic handgun. Shortly after midnight they drove onto Letterly Street, where they encountered their target, Kenny Le, who was with his friend Joe Scott, working on a car. Velezquez fired 14 shots at Le, while Scott dove into the car. Thinking the shooting was over, Scott began to exit the vehicle, when [Marfisi] and Hayward shot at him through the rear seat windows,

totaling at least 20 shots altogether. Le died in the hospital later that day.

Meanwhile, Vargas drove the van to [Marfisi's] grandmother's house, where they taped up the windows before moving the van. Later that same day, [Marfisi] called Vargas's brother, Edwin, bragging about the shooting, and sent a screenshot about the shooting to a friend. Hayward and Butler also sent messages bragging and taking credit for the shooting. Several weeks later Velezquez, Vargas and [Marfisi] burned the van to get rid of any evidence connecting it to the shooting.

On November 15, 2020, [Marfisi] and Derrick Vargas were in a deli they were known to frequent. Video footage from the deli showed [Marfisi] tucking a black and silver firearm into his waistband. A short while later, while standing outside the deli, someone driving by in a black sedan fired several shots at [Marfisi] and Vargas. [Marfisi] pulled his gun and returned fire. Vargas was fatally wounded.

The next day, November 16, 2020, [Marfisi] was in a rage over what he believed to be Instagram posts mocking Vargas's death. [Marfisi] and Butler returned to the vicinity of the Le shooting, where they encountered Michael Walker, who they believed to have made the posts making fun of Vargas's death. In fact, it was Walker's lookalike cousin who had made the posts. [Marfisi] and Butler each fired multiple shots at Michael Walker before leaving the scene. Walker survived, but was severely wounded.

On March 6, 2021, police recovered a black and silver, nine-millimeter Smith & Wesson semiautomatic handgun from an uninvolved person, which ballisticians were able to match to fired cartridge casings at the scene of the October 3, 2020 shooting of Kenny Le; the November 15, 2020 fatal shooting of Derrick Vargas; and the November 16, 2020 shooting of Michael Walker.

During the course of the investigation, in addition to the Instagram and phone messages, police recovered a photograph of [Marfisi] showcasing a black and silver Smith & Wesson semiautomatic handgun, taken on October 10, 2020 – a week after the fatal shooting of Kenny Le. The police also obtained on-line September 30, 2020,

transactional communications between [Marfisi] and the seller of the Chrysler minivan – a few days prior to the Le shooting.

In July 2021, police interviewed [Marfisi] about the Derrick Vargas shooting, during which [Marfisi] admitted to possessing and firing the black and silver Smith & Wesson handgun, and to having had it for a couple of months prior to the Vargas shooting on November 15, 2020.

At trial, Butler and Velezquez, who had been charged as codefendants and entered pleas of guilty, testified about [Marfisi's] involvement in [the] shooting of Le and the events surrounding it. Although Velezquez insisted at trial that he was high and didn't remember many of the events around the Le shooting, his video statement to a federal agent, his signed prior written statement, and his prior testimony were presented as substantive evidence. Butler also testified to his involvement with [Marfisi] in the non-fatal shooting of Michael Walker.

Memorandum Opinion ("Memorandum Op."), filed 4/28/25, at 2-4.

Another Commonwealth witness, Rosalinda Torres, testified about events on the night of Le's shooting, October 3, 2020. On cross-examination, defense counsel asked Torres if she had seen Marfisi in early October 2020 with a colostomy bag and if he had "a hard time walking." N.T., Trial, 5/14/24, at 235. Torres replied that she had seen Marfisi with a colostomy bag and that he had difficulty walking, but that she had not seen him while he was in the hospital recovering. *Id.* at 234-35. She also testified that she went to visit Marfisi on October 3, 2020, and that she saw his wound. *Id.* at 235.

A few days later in the trial, the Commonwealth moved to admit a video from Marfisi's cell phone from September 20, 2020, to contradict counsel's opening statement that Marfisi was in the hospital until the end of September 2020. It was also offered to counter Torres' testimony about whether Marfisi

was in the hospital during that time and his condition after being discharged from the hospital. *See* N.T., Trial, 5/20/24, at 99-100.

Defense counsel responded that her opening statement did not intend to imply an alibi. She stated that she instead suggested that Marfisi would have been incapable of the physical exertion necessary to commit the crimes on October 3, 2020. She also argued that the video would be prejudicial because it showed Marfisi committing an unrelated violent crime. *See id.* at 102-04.

The court granted the Commonwealth's motion, finding the evidence admissible to rebut counsel's suggestion that Marfisi was hospitalized until the end of September 2020. The court also determined that any undue prejudice was outweighed by the probative value of the evidence. The court stated:

> To the extent that [Marfisi's] general incapacity has been implied and to the extent that some of the testimony suggests that he was in the hospital [un]til the end of September, this is admissible to rebut it.
>
> And as to its prejudicial value outweighing its probative value, I don't necessarily think we're quite there. I do think the probative value outweighs the prejudicial value, so I'll let it in.

*Id.* at 107.

The Commonwealth played the video for the jury. It depicted a man assaulting another man while holding what appeared to be a gun. The Commonwealth also admitted evidence that approximately an hour after the timestamp on the video, Marfisi had used his phone to send it to someone, with an accompanying text message, "That's what I do to pussy niggas." *Id.*

- 8 -

at 147. The perpetrator in the video had a tattoo on his hand like a tattoo Marfisi has on his hand. The court gave a limiting instruction:

> Before cross, ladies and gentlemen, the evidence that you've just seen, the soundless video and the text messages, are being offered not to prove the defendant's guilt as to the crimes that's [sic] he charged with in this case, but to rebut the implication or testimony that he was incapacitated or in the hospital until the end of September.
>
> I instruct you to consider this particular piece of evidence for that purpose only.

*Id.* at 148-149.

The Commonwealth also offered into evidence a recording of prison phone calls Vargas made to Marfisi on the day before Le's murder. *See* N.T., 5/15/24, at 76-80. During its closing argument, the Commonwealth highlighted the discussions between Vargas and Marfisi during the calls:

> What else does [Marfisi] say in these phone prison calls on October 2nd, the day before Kenny Le is murdered? He's talking with Edwin Vargas about like some fight, something that went down that happened, and he starts talking about like seemingly a hypothetical situation of what could happen next.
>
> And what does he say? We got the van with both of the doors on both sides. You know I'm in the van so they can't see me. Chitty chit chit bang. And then he talks about a Freddy Krueger massacre, like nightmare on Letterly Street. And the very next day, there is indeed a massacre, a nightmare on Letterly Street, the street that you heard from Donaven Velezquez was where their opps, people that they don't like [to] go.
>
> And you heard from Donaven Velezquez they went to that block not necessarily looking for Chino, but looking for anyone out there who they might have a problem with and they found Chino. There go Chino. And that's when they shot.

Estalin Marfisi did indeed brag about this shooting, this homicide. He may not have done it on social media, but he did on it on October 3rd when he had another call with Edwin Vargas, almost immediately he brings up – the Chinese boul is what he says.

And then what does he say after that? My youngin' hit a home run and knocked it out of the park. My youngin', being Donaven Velezquez. Because in Marfisi's mind, Donovan [sic] Velezquez is the one that took that kill shot, the one that was first out there, the one that first started shooting from that van when Kenny Le went down, giving credit to Donaven Velezquez for what he did.

N.T., 5/21/24, at 65-67.

In its closing, the Commonwealth also discussed one of the co-defendants, Dominick Butler. Butler's testimony identified the participants in Le's murder, including himself and Marfisi. *See* N.T., Trial (Jury) Volume 1, 5/16/24, at 67-78.

Dom Butler. Dom Butler comes out here and this is the first time that he is facing Estalin Marfisi since he got arrested, since he gave a statement, and since he decided to cooperate. And, understandably, he might be a little nervous for that reason. In fact, you even heard during his questioning, you heard him saying something about [it] in his statement[,] he told the agent, he said, You're trying to make me be a rat. Because that's what he considers himself to be. He considers himself to be a rat.

And being a rat is not a good thing, members of the jury. There is not a lot of times that I will say that T.V. and movies get it correct when it comes to this job. But what they do get right is being a rat is a very bad thing. Being a rat makes you unsafe. Being a rat could get you possibly killed. So no one wants to come and sit in that chair and face the person in front of them and be a rat.

So, understandably, Dom Butler was probably a little nervous when he first came out here. And I had to remind him of some of the testimony he gave prior, some of the

> testimony he gave when he was at another hearing without Estalin Marfisi there, when he didn't have to face him. So keep that in mind and keep that in consideration.

N.T., Trial (Jury) Volume 3, 5/21/24, at 46-47.

Following closing arguments, defense counsel objected and moved for a mistrial for the Commonwealth's reference to the prison calls. She argued that the Commonwealth had engaged in prosecutorial misconduct when it "[p]icked up the transcript and then read from it, when we have no testimony of whose voice was that, when there was no transcript read." *Id.* at 75. Counsel claimed that by doing this, the prosecutor had implied that the Commonwealth had an official transcript and asked that the court either grant a mistrial or give a curative instruction to the jury. The Commonwealth stated that it was referencing its notes, and even if it had implied that there was a transcript, the court had instructed the jury that it should rely on its memory. *Id.* at 77. The court overruled the objection and denied the motion for mistrial. It found that "[t]here's no reference to that transcript as being part of the record. It's no different from counsel referring from her notes." *Id.* at 77-78.

Counsel also objected to the Commonwealth's remarks about Butler. She argued that the remarks implied "that there's been some kind of threat in this case . . . to not testify or to testify." *Id.* at 76. Counsel asked for a curative instruction for this comment as well. The Commonwealth replied that inferences are permitted during closing and that it did not "suggest that it was Estalin Marfisi or . . . his family who were the ones that made any threat against him, who may have threatened his life, or anything to that effect." *Id.*

at 78. The court overruled the objection. It determined that the Commonwealth's argument was "fully within the []ambit of the facts in this case and it's fair argument as fair inference from the facts." *Id.* at 79. The court declined to give curative instructions for both statements.

The jury convicted Marfisi in two of the cases – the charges related to the shooting of Le and the possession of the firearm – and found Marfisi guilty of the above offenses. However, it acquitted him of attempted murder for the shooting of Michael Walker.[5] The court sentenced him to an aggregate term of 38½ to 77 years' incarceration. Marfisi filed a motion for reconsideration of his sentence, alleging that the sentence did not reflect the mitigating factors. *See* Motion to Reconsider Sentence, filed 8/30/24, at ¶ 5. The court denied the motion. *See* Docket 8545, Entry 181; Docket 8548, Entry 169. This timely appeal followed.

Marfisi presents the following questions:

I.    Did the lower court err in granting consolidation of [Marfisi's] two unrelated cases for trial where evidence of each of the offenses would not be admissible in a separate trial for the other and where [Marfisi] was unduly prejudiced by the consolidation of the offenses?

II.   Did the trial court abuse its discretion in ruling that a witness could present expert testimony that a photograph of [Marfisi] with a gun that was uploaded on October 10, 2020, was also taken on October 10, 2020, one week after the murder of Kenny Le, based on his analysis of metadata where the prosecutor had

_____

[5] *See* Common Pleas docket number CP-51-CR-0008542-2022.

specifically represented to the defense that she would not offer expert testimony on this issue?

III. Did the trial court abuse its discretion in permitting the Commonwealth to introduce into evidence a prejudicial cell phone video showing [Marfisi] committing an unrelated crime over the defense's objection?

IV. Did the trial court err in denying [Marfisi's] request for a mistrial where the Commonwealth's attorney committed two instances of prosecutorial misconduct during her summation?

V. Did the lower court abuse its discretion in sentencing [Marfisi] to a manifestly excessive sentence of 38 ½ to 77 years of imprisonment where the court disregarded substantial evidence that would have supported the imposition of a mitigated sentence?

Marfisi's Br. at 5-6 (answers of trial court committed).

Marfisi first argues that the court erred in granting the Commonwealth's motion to consolidate his cases. He claims that evidence in each case would not be admissible in a separate trial of the other and the consolidation was prejudicial. He maintains that while the prosecutor referred to "a lot of overlapping evidence," she only identified three pieces of evidence admissible in all three cases: a photo of Marfisi holding a gun he admitting having possessed; the testimony of Derrick Butler; and Marfisi's statement to police admitting possessing the gun. Marfisi concedes that ballistics evidence showed that the same gun was used in all three shootings. He also admits that there was evidence that Le was murdered because he had "shot up Vargas's mother's house." *Id.* at 22. He also acknowledges evidence that Michael Walker was shot because someone "was making fun of Vargas'[s] death on

Instagram," and in a case of mistaken identity, Marfisi and Butler shot Walker. *Id.* However, he asserts that no evidence linked Le's killing to Walker's shooting. Marfisi also argues the consolidation of the cases was prejudicial because the joining of "unrelated and dissimilar crimes" permitted the Commonwealth to invite "the jury to convict [Marfisi] based solely on his propensity to commit crimes." *Id.* at 23.

Whether to join offenses for trial is committed to the trial court's sound discretion. Absent an abuse of that discretion, the decision of the court will not be reversed. *See Commonwealth v. Knoble*, 188 A.3d 1199, 1205 (Pa.Super. 2018).

Offenses charged as separate cases may be joined for trial "if the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion[.]" Pa.R.Crim.P. 582(A)(1). When a court considers whether to join cases together, it "must first determine if the evidence of each of the offenses would be admissible in a separate trial for the other." *Commonwealth v. Dozzo*, 991 A.2d 898, 902 (Pa.Super. 2010) (citation omitted). Where the court believes that trying the cases together would prejudice any party, the court may order separate trials. Pa.R.Crim.P. 583. "Under Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." *Dozzo*, 991 A.2d at 902.

Evidence offered to establish a defendant's propensity to commit a crime or bad character is inadmissible. **See** Pa.R.E. 404(b)(1). However, evidence of crimes, wrongs, or acts offered for a proper purpose, such as to show motive or identity, is admissible if "the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2) (stating evidence of other crimes, wrongs, or acts may be admissible for purposes such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). Additionally, "evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts." **Commonwealth v. Collins**, 703 A.2d 418, 423 (Pa. 1997).

Here, the trial court did not abuse its discretion in consolidating the cases. Marfisi has not identified evidence that was admissible against him in one case but not the other. Moreover, the charges each involved the use of a firearm linked to Marfisi. As such, the ballistics evidence showing the same firearm was used in each of the cases was admissible in each case for the purpose of proving identity. Furthermore, consolidating the cases provided context to the allegations in each case, considering the brief time span between each case. Thus, the evidence for each of the offenses for the separate cases formed part of the natural development of the facts of the case.

In his next two issues, Marfisi challenges the admission of evidence. He first alleges the court erroneously permitted the Commonwealth to present

expert testimony related to the metadata of a photograph recovered from Marfisi's cell phone. He claims that this was a direct violation of Rule 573(B)(1)(e) of the Pennsylvania Rules of Criminal Procedure because "the Commonwealth had not previously notified the defense that it would offer this expert testimony[.]" Marfisi's Br. at 26-27. Marfisi also alleges that the Commonwealth's "eleventh hour announcement" on the day of trial that it would present expert testimony amounted to "trial by ambush." *Id.* at 27. Marfisi maintains that he had planned to argue that the time of the photo could not be connected to the time of the murder, but the allowance of the expert testimony "forced" him "to abandon this strategy on the day of trial." *Id.* He distinguishes the instant case from *Commonwealth v. Clemat*, 218 A.3d 944, 953 (Pa.Super. 2019), where this Court determined that the appellant was not prejudiced by the Commonwealth's late disclosure of an expert witness. He argues that, unlike in *Clemat*, here the Commonwealth failed to notify the defense that the witness would testify as an expert on metadata and explain his analysis of the metadata from the photograph to determine when it was taken.

Additionally, Marfisi argues that the court erred by permitting the Commonwealth to play the cell phone video showing Marfisi assaulting a person to rebut the defense's opening statement. He argues that the video was unrelated to any of Marfisi's charges, and the prejudice resulting from the jury seeing him commit an unrelated violent crime outweighed any probative value of the evidence. He further claims that there was no need for the

Commonwealth to rebut the defense's suggestion that Marfisi was hospitalized at the time of the shooting because the defense only established that Marfisi was injured and, therefore, it would have been difficult for him to crouch in the van on the day of the shooting.

We review a court's evidentiary rulings for an abuse of discretion. *See Commonwealth v. Hernandez*, 230 A.3d 480, 489 (Pa.Super. 2020).

Here, the trial court concluded that it properly exercised its discretion in overruling Marfisi's objection to the cellphone extraction evidence.

> During an extensive exchange with defense counsel and counsel for the Commonwealth, it was determined that defense counsel had the phone extraction report and all the information about the photograph. The objection came down to whether the Commonwealth had somehow misled the defense regarding the photograph creation evidence and how it would be presented. The Court concluded that there was no intentional misrepresentation by the Commonwealth, simply attorneys not entirely understanding each other as to how the evidence would be presented and how the witness would be characterized. But at the end of the day, the defense had all the necessary information in its possession and suffered no undue prejudice. Accordingly, the court overruled the objection.

Memorandum Op. at 5 (citations omitted). As to the video, the court found that "[t]he evidence was proper rebuttal, and as such it was more probative than prejudicial. Further, any prejudice was cured by the specific, contemporaneous instruction to the jury as to how they were to consider the evidence." *Id.* at 6.

We find no abuse of discretion. Although the Commonwealth did not inform counsel in a timely manner that it would present expert testimony

about the metadata from the photograph, the metadata was not new evidence. Even considering that the Commonwealth assured counsel that it would not call an expert witness regarding the phone location and GPS, defense counsel was not precluded from calling her own expert witness on metadata. Furthermore, Marfisi did not suffer any undue prejudice from the detective's testimony because the evidence at trial established that Marfisi admitted to possessing and firing the firearm and having it prior to November 2020. *See* Memorandum Op. at 3.

Regarding the video evidence, this claim is also meritless. The evidence rebutted counsel's suggestion to the jury about the level of difficulty Marfisi would have had to crouch inside the van used during Le's murder. Additionally, any prejudice created from the jury viewing the video was cured by the court's limiting instruction.

Next, Marfisi argues that the court abused its discretion in denying his motion for a mistrial for the Commonwealth's statements during its closing argument. He claims that "the prosecutor improperly insinuated to the jury that she had a transcript of [Marfisi's] inculpatory statements when she read from a document and said "[f]orgive me because I want to make sure I get this right when I read this . . ." Marfisi's Br. at 36 (quoting N.T., 5/21/24, at 65). He also argues that the Commonwealth's comments about Butler inflamed the jury and caused it to speculate whether the witness had been threatened by Marfisi. This claim is meritless.

We review the denial of a mistrial for an abuse of discretion. ***See Commonwealth v. Johnson***, 107 A.3d 52, 77 (Pa. 2014). A court may grant a motion for a mistrial "where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." ***Id.*** (citation omitted). Additionally, "a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice." ***Id.*** (citation omitted).

We review a claim alleging improper prosecutorial comments for an abuse of discretion. ***See Commonwealth v. Jones***, 191 A.3d 830, 835 (Pa.Super. 2018). For closing arguments, the prosecution is given "considerable latitude . . . and his or her statements are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." ***Commonwealth v. Noel***, 53 A.3d 848, 858 (Pa.Super. 2012). Prosecutorial misconduct occurs when "the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." ***Id.*** (citation and internal quotation marks omitted). We do not view the statements in a vacuum but rather in context. ***Commonwealth v. Bedford***, 50 A.3d 707, 715-16 (Pa.Super. 2012) (*en banc*).

The prosecutor's statements did not insinuate that she had a physical transcript of the prison calls. As the trial court explained, her statements were

a reference to her notes. Therefore, the Commonwealth did not violate any court order regarding the inadmissibility of the transcript. Additionally, the Commonwealth's statements about Butler, when read in context, were proper to explain why he might have been nervous to testify. Immediately following the Commonwealth's discussion about the consequences of being a "rat," it went on to say, "So, understandably, Dom Butler was probably a little nervous when he first came out here." N.T., 5/21/24, Trial (Jury) Volume 3, at 47. Also, before it made the statements about Butler considering himself a "rat," the Commonwealth talked about Butler agreeing to testify for the Commonwealth, the amount of prison time he could potentially face, and that defense counsel suggested that the testimony of the co-defendants was "a corrupt and polluted source[.]" *Id.* at 42-46. It also explained that the co-defendants in the case, including Butler, were friends with Marfisi. *Id.* at 45.

When viewed in context, the prosecution was making an argument about why Butler may have been nervous during his testimony. Furthermore, considering that defense counsel had suggested that he was a "corrupt and polluted source," the Commonwealth's discussion of Butler viewing himself as a rat and the potential consequences that come along with that was fair and reasonable, considering the evidence. Moreover, we cannot say that either of the comments had the unavoidable effect of prejudicing the jury against Marfisi such that it could not render a "true" verdict.

Marfisi's final issue addresses the discretionary aspects of his sentence. For such a claim, there is no absolute right to appeal. *See Commonwealth*

*v. Devine*, 326 A.3d 935, 939 (Pa.Super. 2024), *appeal denied*, 337 A.3d 373 (Pa. 2025). Rather, we must first determine whether the appellant: 1) filed a timely appeal; 2) preserved the issue at sentencing or in a post-sentence motion; 3) has filed a Pa.R.A.P. 2119(f) statement; and 4) raised a substantial question. *See Commonwealth v. Starr*, 234 A.3d 755, 759 (Pa.Super. 2020).

We address the merits of Marfisi's claim because he has satisfied all the above requirements. Marfisi's appeal is timely, his issue was preserved, his brief includes a Rule 2119(f) statement, and he has raised a substantial question. He alleges that the trial court imposed an unduly harsh sentence that disregarded any of his mitigating factors, such as his age at the time of the crime, his upbringing, and rehabilitative needs. This is a substantial question. *See Commonwealth v. Lamonda*, 52 A.3d 365, 372 (Pa.Super. 2012) (*en banc*). He also raises a substantial question that the court improperly focused solely on the serious nature of the crimes and the impact on the victims and community. *See Commonwealth v. Boyer*, 856 A.2d 149, 152 (Pa.Super. 2004).

Substantively, Marfisi's claim is meritless. At the sentencing hearing, the court heard from defense counsel that Marfisi was 20 years old at the time of the crime, that he was remorseful, and that he had a "very traumatic and troubled past." N.T., Sentencing Volume 1, 8/23/24, at 8, 12. Counsel stated that Marfisi did not know his father, had been committed to a mental facility at the age of 13, and had suffered abuse. *Id.* at 12-13. She also spoke about

Marfisi's drug addiction, that he dropped out of school, and that he had a prior record score of two. *Id.* at 14-15. The court also heard from Marfisi's high school friend and his sister. *See id.* at 28-32. Marfisi expressed his remorse to the court and his desire to "take all the help I can to better myself and use this time that I'm in jail so I can better myself so I can get back home to my family." *Id.* at 54.

Before sentencing Marfisi, the court explained that it had considered "the presentence report, the mental health evaluation report, the sentencing guidelines, the mental health report, the arguments of both counsel, the Commonwealth's sentencing memorandum as well as the defense sentencing memo." *Id.* at 63. It also considered the victim impact statements and the testimony of Marfisi's sister and of a friend. *Id.* The court made note that it agreed "that [Marfisi's] personal history is tragic and this [c]ourt recognizes that it played a part in who [Marfisi] became while he was doing these things. It's also not lost on this [c]ourt that [Marfisi] is 24 today and was 20 at the time of these incidents." *Id.* at 65. Thus, the record shows that the court aptly articulated all its considerations, including Marfisi's mitigating factors, and did not solely focus on the violent nature of his crimes and the impact on the victims and the community.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>3/13/2026</u>